**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CATHERINE ADAMS, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HSBC BANK U.S.A., N.A., and DOES 1-100,<br><br>Defendants. | Case No.:<br><br>ECF Case<br><br>Class Action<br><br>Demand for Jury Trial |

## COMPLAINT

Plaintiff Catherine Adams ("Plaintiff"), by her attorneys, hereby brings this class and representative action against HSBC Bank U.S.A., N.A., and DOES 1 through 100 ("HSBC" or "Defendant").

## NATURE OF THE ACTION

1. All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel. Allegations pertaining to Plaintiff or her counsel are based upon, inter alia, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2. This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all others persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. HSBC wrongfully charged Plaintiff and the class member overdraft fees.

3. This class action seeks monetary damages, restitution, and injunctive relief due to HSBC's policy and practice of assessing an overdraft fee on transactions when there was enough

money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches HSBC's contract with its customers, who include Plaintiff and the members of the Class. The charging by HSBC for overdraft fees also violates federal law because HSBC failed to properly opt-in its customers into the overdraft fee program pursuant to Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*).

## PARTIES

4. Plaintiff is a resident of Greer, South Carolina, and was a member of HSBC at all times relevant to the class action allegations. During the majority of her relationship with HSBC, Plaintiff resided in New York, New York.

5. Based on information and belief, Defendant HSBC is and has been a chartered commercial bank with its official headquarters listed in Wilmington, DE, but its actual business headquarters in New York, New York. Defendant is the principal subsidiary of HSBC USA Inc., an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc. HSBC is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

6. Without limitation, defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of HSBC and, upon information and belief, also own and/or operate HSBC branch locations. Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "HSBC" is also inclusive of Defendants Does 1 through 100.

7. Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

8. Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

9. As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (1) the claims of plaintiffs aggregated together exceed $5,000,000, and (2) some putative class members are residents of different states than Defendant. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District and a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

### A. HSBC's Unlawful Charges of Overdraft Fees

12. HSBC is bank with more than 470 branch offices throughout the United States of America, including branches in New York, Connecticut, Washington, D.C., Florida, New Jersey, Pennsylvania, Maryland, Virginia, California, Delaware, Illinois, Oregon and Washington State, with approximately $209.3 billion in assets. HSBC offers its consumer banking customers a checking account. One of the features of a HSBC checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services. In addition to receiving a debit card, other features of a HSBC checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

13. In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), HSBC assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

14. Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions. While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks. For credit unions such as HSBC, overdraft fees are a major source of revenue and a profit center. According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6 to 7% of the gross revenue of credit unions. (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds? Filene Research Institute 2010).

15. The high cost of an overdraft fee is usually unfairly punitive. In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake. (May 2012 Pew Charitable Trust report entitled "Overdraft America: Confusion and Concerns about Bank Practices", at p. 4). More than 60% of the transactions that resulted in a large overdraft fee were for less than $50. (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8). More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

16. Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. (*Id*. at p. 1). A 25 year-old is 133% more likely to pay an overdraft penalty fee than a 65 year-old. (*Id*. at p. 3). More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id*. at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id*. at p. 3).

17. As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the

possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

18. The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

19. To qualify as affirmative consent, the opt-in agreement must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft;
- The opt-in consent must be obtained separately from other consents and acknowledgements;
- The consent cannot serve any purpose other than opting into the overdraft program;
- The consent cannot be a pre-selected checked box;
- The financial institution may not provide different terms for the accountdepending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_ Rulemaking.pdf , at p. 74-75.

20. At all relevant times, HSBC has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to HSBC's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment o overdraft fees.

21. HSBC entered into an agreement with Plaintiff and the class members titled "Rules for Consumer Deposit Accounts," (the "Account Agreement") which states the terms under which HSBC may assess overdraft fees against its customers, and is attached hereto as Exhibit 1. In the Account Agreement, in a section titled "Overdrafts and overdraft fees," HSBC promises that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." This promise means that HSBC is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction. By using the term "account" without a modifier, HSBC promises that the entire account, and not a subset of the account, will be compared against the charge to determine whether an overdraft occurred.

22. However, directly contrary to this promise, HSBC's policy and practice is to ignore whether there is money in the account or a negative balance. Instead, HSBC's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation called the available-balance method rather than the ledger-balance method.

23. The available balance is not the customer's actual balance (ledger balance). Rather, it is the actual balance of a customer's account (ledger balance) *minus* anticipated future debits (debits that may or may not occur) and *minus* credit holds. Not only is the practice of using the available-balance method rather than the ledger-balance method to determine whether a transaction results in an overdraft and thus is subject to an overdraft fee directly contrary to HSBC's Account Agreement, but such practices have resulted in HSBC improperly charging, and continuing to charge, its members, including Plaintiff and the members of the Class, unlawful overdraft fees. Whether a financial institution uses the ledger-balance method versus the available-balance method is a primary concern for the Consumer Financial Protection Bureau

("Bureau") due to the substantial harm it causes to customers. As the Bureau concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter 2015, at p.8[2]:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method.

When the balance calculation method is not adequately disclosed, the Bureau has found the use of the available-balance method instead of the ledger-balance method a deceptive practice, as it results in "customers being misled" because this information is "material to a reasonable consumer's decision-making and actions", and consumers are thereby "substantially injured". (*Id*. at p. 9.)

24. HSBC's practice of charging overdraft fees, even when there is money in the account to cover a transaction presented for payment, is inconsistent with how HSBC expressly describes the circumstances under which overdraft fees are assessed in its Account Agreement. Further, HSBC failed to properly opt-in its customers into the overdraft fee program in violation of Regulation E.

25. The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in

---

[2] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

fees as not opted-in accounts.[3]

26. Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

27. Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods. The ledger balance is the official balance of the account. It is the balance provided to the customer in monthly statements, which is the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements.

28. Further, based on information and belief, it is the balance used by HSBC to report its deposits to regulators, shareholders and the public. It is the deposit balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of HSBC.

29. When HSBC refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the ledger balance. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the ledger balance and not the available balance, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p.9.)

30. Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

**B. Unlawful Overdraft Fees Assessed to Plaintiff**

31. Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in her account to cover the transaction. Plaintiff entered into an agreement with HSBC wherein HSBC contracted to charge overdraft fees only if her account did not have money to cover the transaction, and did not enter into a separate "Opt In" agreement pertaining to overdraft fees. By charging Plaintiff overdraft fees when her account did contain enough money to complete the transaction, HSBC breached its contract with Plaintiff. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give one example, on September 14, 2015, Plaintiff had a positive balance of $992.89 in her checking account when she made a payment of $300.00, leaving her with a positive balance of $692.89. Despite the fact that Plaintiff had sufficient funds in her account to cover the transaction, HSBC assessed a $35.00 overdraft fee against her account that it identified as a "Service Charge for Unavailable Funds". Plaintiff has a reasonable belief that a complete review of Plaintiff's and HSBC's records will show additional instances in which HSBC improperly charged Plaintiff overdraft fees for transactions.

32. Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which HSBC assesses further overdraft fees. This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later

> presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.) A complete evaluation of HSBC's records is necessary to determine the full extent of Plaintiff's harm from this practice.

33. Additionally, HSBC further violated Regulation E by charging overdraft fees on relevant transactions without obtaining customer's informed consent to do so, and by providing different terms for accounts based on overdraft status for different account tiers.

34. Plaintiff was harmed by HSBC's practices when she was assessed overdraft fees when they should not have been assessed. A complete evaluation of HSBC's records is necessary to determine the full extent of Plaintiff's harm.

## CLASS ACTION ALLEGATIONS

35. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

36. Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

37. The "Class" is composed of two classes:

**The Positive Balance Class:**

> **All United States residents who have or have had accounts with HSBC who**

**incurred overdraft fees when the ledger balance in the checking account was sufficient to cover the transactions in the six years preceding the filing of this Complaint.**

**The Regulation E Class:**

**All United States residents who have or have had accounts with HSBC who incurred overdraft fee(s) for ATM or non-recurring debit card transactions since August 15, 2010.**

38. Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

39. This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

40. **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include tens of thousands of members based on the fact that HSBC has approximately $209 billion in assets and operates branches throughout the nation, in at least 12 states.

41. Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of HSBC's customers have been harmed by its practices and thus qualify as Class members. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other

publications.

42. **<u>Commonality (Federal Rule of Civil Procedure 23(a)(2)</u>** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

a. Whether, pursuant to the Account Agreement, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b. Whether Defendant breached the Account Agreement by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

c. Whether the language in the Account Agreement—"An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees using an available-balance method instead of a ledger-balance method;

d. Whether Defendant is liable under claims of breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

e. Whether Defendant's conduct violated state consumer protection laws; and

f. Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

43. **<u>Typicality (Federal Rule of Civil Procedure 23(a)(3))</u>** – Plaintiff's claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were

sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

44. **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

45. **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication

of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

46. Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant. Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because, during the majority of the time at issue in this case, Plaintiff resided in New York, New York, where Defendant operates branch offices, and where its actual business headquarters are located, and because the claims arose from activities which occurred primarily in New York, New York. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

47. Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

48. This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

    1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or
    2. Adjudication with respect to individual members of the Class,

which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

   1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;
   2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;
   3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
   4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

49. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

50. Plaintiff and each of the Class members entered into a contract with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement. This contract was drafted by and is binding upon Defendant.

51. In the contract, Defendant promised that HSBC would assess overdraft fees only

when there was not enough money in the account to cover the transaction.

52. Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

53. Defendant breached the express terms of the contract by, inter alia, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

54. As a proximate result of Defendant's breach of the contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

55. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

56. Plaintiff and each of the Class members entered into a contract with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement. This contract was drafted by and is binding upon Defendant.

57. In the contract, Defendant promised that HSBC would assess overdraft fees for only when there was not enough money in the account to cover the transaction.

58. Further, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of

bad faith in the performance of contracts.

59. The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

60. Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

61. Defendant breached the implied covenant of good faith and fair dealing based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to opt in appropriately inter alia, by failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions, or alternatively failing to opt in as required altogether, and failing to permit its customers to choose whether to opt-in to the overdraft program for non-recurring debit and ATM transactions. In so doing, Defendant executed a contractual obligation in bad faith, by implementing an overdraft practice for the purpose of increasing overdraft fees, depriving Plaintiff and the Class members of the full benefit of the contract.

62. As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

63. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

64. As a result of the wrongful misconduct alleged above, Defendant unjustly

received millions of dollars in overdraft fees.

65. The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices. (CFPB Bulletin 2013-07[4], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

66. Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

**(Money Had and Received)**

67. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

---

[4] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

68. Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

69. As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

**(Violation of Electronic Fund Transfers Act (Regulation E)**

**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.))**

70. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

71. By charging overdraft fees on ATM and nonrecurring debit transactions, HSBC violated the UCL by violating Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

72. Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.) The Opt In Rule states: "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must

provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

73. The intent and purpose of this opt-in notice is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

74. HSBC failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. HSBC has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17, or to give them the opportunity to affirmatively consent—or not consent—to entry into the program, and for creating different terms of the account depending on the status of the overdraft fee program applicable to different account tiers.

75. As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so HSBC has harmed Plaintiff and the Class.

76. Due to HSBC's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and

costs of suit pursuant to 15 U.S.C.A. § 1693m.

## SIXTH CAUSE OF ACTION

**(For Violation of New York General Business Law § 349)**

77. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

78. By the actions alleged above, Defendant has engaged in deceptive acts or practices against Plaintiff and the Class members in violation of New York General Business Law § 349. The practices were deceptive because, *inter alia*, Defendant promised Plaintiff and the Class members that it would only assess fees for overdrafts where the transaction at issue exceeded the customer's ledger balance, i.e., the actual amount of money in the customer's account, and instead assessed fees based on a limited portion of the customer's account called the "available balance," when the actual balance contained enough money to complete the transaction, and because of the same conduct which resulted in Defendant's violation of Reg. E.

79. Under § 349(h) Plaintiff and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;
2. For compensatory damages on all applicable claims and in an amount to be proven at trial;
3. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;
4. For an order enjoining the wrongful conduct alleged herein;
5. For costs;
6. For pre-judgment and post-judgment interest as provided by law;
7. For attorneys' fees under the Electronic Fund Transfer Act, the common fund

doctrine, and all other applicable law; and

8. For such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and the Class members demand a trial by jury on all issues so triable.

DATED: July 19, 2016

BY: *__/s/ Mitchell M. Breit__*

Mitchell M. Breit,
mbreit@simmonsfirms.com
**SIMMONS HANLY CONROY**
112 Madison Avenue
New York, NY 10016
Telephone (212) 784-6400
Facsimile (212) 213-5949

Richard D. McCune, State Bar No. 132124*
rdm@mccunewright.com
Jae (Eddie) K. Kim, State Bar No. 236805*
jkk@mccunewright.com
**McCUNEWRIGHT LLP**
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Taras Kick, State Bar No. 143379*
Taras@kicklawfirm.com
James Strenio, State Bar No. 177624*
James@kicklawfirm.com
Robert Dart, State Bar No. 264060*
Robert@kicklawfirm.com
**THE KICK LAW FIRM, APC**
201 Wilshire Boulevard
Santa Monica, California 90401
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

Attorneys for Plaintiff Catherine Adams
and the Putative Class

**Pro Hac Vice* Petitions to be submitted